[Civ. No. 16444. Second Dist., Div. One. Feb. 28, 1949.]

JACKSON EARL WHEELER et al., Appellants, v. J. D. GREGG et al., Respondents.

Oliver O. Clark and Robert A. Smith for Appellants.

Ray L. Chesebro, City Attorney, Roger Arnebergh, Assistant City Attorney, Thomas H. Hearn, Deputy City Attorney, Donald J. Dunne and Guy Richards Crump for Respondents.

WHITE, J.—Plaintiffs herein, numbering 25 individual and one corporate property owners whose properties lie within 3,000 feet of 115 acres of land owned or leased by defendant Gregg, instituted this action to have declared unconstitutional and void the action of the council of the city of Los Angeles whereby, on October 2, 1946, said council granted to defendant Gregg a variance permit (in reality a conditional use

permit under section 12.24 of Ordinance No. 90500) to excavate for the commercial production of rock, sand and gravel in an area of land containing some 105 acres. Plaintiffs alleged that the action was also brought in behalf of the planning commission, park department, playground and recreational department and board of education of defendant city. They also alleged that their action was prosecuted for the benefit of more than one thousand persons living within what plaintiffs described as ''the community area,'' alleging that ''the situation of said agencies is similar to the situation of these named plaintiffs in respect to their own properties,'' and that with reference to the aforesaid more than one thousand persons, the enjoyment of their homes within said ''community area'' and their health and safety ''would be substantially, materially, and injuriously affected in kind substantially as would be these named plaintiffs'' from defendant Gregg's operations in the area in question.

By their complaint, plaintiffs sought a decree:

(1) Declaring void a variance permit (really, as stated above, a conditional use permit) granted defendant Gregg by defendant city by which Gregg was authorized to excavate and remove rock, sand and gravel from the permit area;

(2) Enjoining the city from granting any permit for the commercial production of rock, sand and gravel from any lands included within the so-called community area;

(3) Enjoining defendant Gregg from (a) exercising any right, benefit or privilege under the permit granted him by the city, and (b) from conducting any operation for the commercial production of rock, sand and gravel within the so-called community area;

(4) As against defendant Gregg the recovery of actual damages ''accrued'' to the date of judgment, together with $250,000 punitive damages;

(5) General relief.

Defendants filed separate answers each denying the material allegations of the complaint. Following trial the court rendered judgment for defendants, but in so doing required defendant Gregg to comply with certain operational conditions imposed by its decree, in addition to the conditions imposed by the city in its permit.

The conditions imposed by defendant city were:

''1. That the applicant (Gregg) construct a 6-foot cyclone type mesh wire fence around the said property, including

barbed wire on the top of said fence, providing the Fire Department grants permission for same.

"2. That no permanent plant, building or structure be installed or maintained on said property and that all material excavated be mined by an electrically powered shovel and primary crusher and transported by a conveyor belt system running through a tunnel or tunnels under Glenoaks Boulevard to the plant now operated by applicant, lying southwesterly of said boulevard and processed at said plant.

"3. That a set-back line of 50 feet from all property lines and existing streets be maintained and that slopes of excavations be maintained at one foot to one foot.

"4. That the area between all property lines or street lines and 50 foot set-back be screen planted progressively as excavations proceed."

To the foregoing conditions the court added the following:

"1. That defendant John D. Gregg shall not conduct any operation for the excavation of rock, sand or gravel from the so-called 'Critical' area, as described in the complaint herein, lying northeasterly of Glenoaks Boulevard at any time before 6:00 o'clock A.M. of any day, or after 8:00 o'clock P.M. of any day, excepting that the said defendant John D. Gregg shall not be prohibited from making any reasonable or necessary repairs to equipment in said area during other hours.

"2. That said defendant John D. Gregg house in any primary crusher which is operated in that portion of the so-called 'Critical' area lying northeasterly of Glenoaks Boulevard so as to minimize any noise emanating therefrom.

"3. That in connection with any and all drag-line operations on the banks or slopes of any pit excavated by defendant John D. Gregg in that part of the so-called 'Critical' area lying northeasterly of Glenoaks Boulevard, that the said defendant John D. Gregg shall cause the banks or slopes of said excavation to be sprinkled with water prior to any such dragline operations, so as to minimize the possibility of dust from any such operation being carried by the winds beyond the boundaries of said so-called 'Critical' area.

"4. That said defendant John D. Gregg, as soon as reasonably practicable and as soon as material and equipment is available, shall complete the construction of the dust collection system in his rock crusher plant located southwesterly of Glenoaks Boulevard, the construction of which system was commenced prior to the commencement of this action."

With reference to the physical characteristics of the area involved, there was testimony that the soil in what we shall designate as the "permit area" consists of quite a range in sizes of soil particles from large rocks down to some fine silt. It is not uniform either in the vertical horizon or laterally. It has been laid down by rather fast-moving water, and as the streams have changed directions and changed velocities they have deposited in a rather heterogeneous manner various particles in rather close areas, so that there is no one property that has a uniform type of soil. It is what is termed gravelly soil. In some places there are soils having a sufficiently fine deposit to be termed a sandy loam. There are some small parcels or portions that could be called gravelly loam, but, for the most part it is a gravelly soil; that "The permit area is cut up by stream beds. It is badly eroded by what we term flood erosion due to the surface flows following flash floods, so that there are many small depressions due to that. The difference in elevation will vary two or three feet in very short distances in many places, in some places the depth of these washes and depressions is as much as five or six feet; there are one or two pronounced ridges, and the topography is so uneven that at the present time no agricultural work could be carried on without levelling. If it were to be laid out for an irrigation system in which pipelines are used and the furrow method is employed, it would be necessary to do very extensive, a very extensive amount of grading. If a sprinkling system was used a less amount of grading would be required, however there would be a considerable amount necessary even in the event a sprinkling system was used." That from the standpoint of farming, "no part" of the permit area "has any agricultural value whatever."

Although residences could be and have been constructed in the permit area, there was substantial evidence that, "As regards the permit area, I believe the most profitable use to which that property can be put is for the extraction of rock, sand, and gravel. The highest and best use means the highest, best and most profitable. The word 'profitable' is commonly connected with the highest and best, and means that use which will produce the highest rental value or leasehold value or market value of the fee"; that the highest and best use of the entire area including the permit area, is "to develop the natural resources that exist upon it," namely, rock and sand. There was also evidence showing the proximity of the permit area to numerous gravel pits, both operating and

abandoned, rubbish dumps, a winery and other industrial uses.

There was also testimony given by qualified experts that none of plaintiffs' properties were adversely affected "value-wise," by reason of the action of the city council in granting the conditional use permit to defendant Gregg. That the depreciation in value of the properties since October 1, 1946, was due to the general decline in the values of real estate in the Los Angeles area in general and in the area district here in question in particular. That the decline in values in the San Fernando Valley is comparable to the decline in such values throughout Los Angeles County and the United States since October 1, 1946, the date of the permit here challenged.

Plaintiffs presented evidence that in 1914 the lands here in question were subdivided for residential-agricultural use and were by deed restrictions limited to such use for the ensuing 20 years. That thereupon these lands were offered for sale and a considerable amount thereof was sold and developed for residential uses. That in 1914 the area here in question, then known as a part of Hansen Heights, was annexed to the city of Los Angeles; that in 1919, the residents of that area, in conjunction with those of a larger area, organized Municipal Improvement District No. 9 and bonded their properties for $150,000 to obtain, and assure, an adequate water supply for this area; that in July, 1925, nearly nine years before the expiration of the aforesaid deed restrictions, the defendant city enacted its Zoning Ordinance No. 52421, by which this community area was declared to be a residential area, and from which the mining of rock aggregates was excluded; that in June, 1926; May, 1927; August 15, 1927; and August 27, 1927, by its enactment of ordinances numbered respectively 55129, 57958, 58624 and 58375, defendant city reaffirmed its zoning classification of this community area as a residential area, and its exclusion therefrom of the business of mining rock aggregates; that in June, 1926, and in June, 1928, upon petition of the people, defendant city consummated proceedings for the concrete paving of about 7½ miles of the public streets within said area, and assessed the costs of said improvement upon the lands within said area; that in 1928, upon petition of the people, the defendant city consummated proceedings for the organization of Municipal Improvement District No. 57, and the acquisition and improvement of a 15-acre public park and recreation center, on the westerly side of Wicks Avenue, immediately southerly

of Dronfield Avenue, in said community area, and bonded the property within said community area for the payment of its cost; that in June, 1930; February, 1933; September, 1934 and November, 1936, defendant city by its enactment of ordinances numbered, respectively, 66750; 72327; 74140, and 77000 reaffirmed its zoning classification of this community area as a residential area, and its exclusion therefrom of the business of mining rock aggregates; that in August, 1934; July 7th, 1936; July 21st, 1936; July 7th, 1939, and January, 1940, the city planning commission reaffirmed its zoning classification of this community, by denying five separate applications for permission to mine rock aggregates within this community area. Two of these applications were denied, upon appeal, by the city council. Three of these applications involved land covered by the permit challenged here. That in 1942, upon petition of the people, the Remsen Avenue school, located about one-half mile westerly of this community area, and about 900 feet from a potential rock excavation operation, was abandoned, and as a replacement therefor, the Stonehurst school was established within this community area about 600 feet from the area covered by the permit under challenge herein; that in 1944 the city began, and continued through 1945, and until March 7th, 1946, a comprehensive survey and study of zoning conditions, and on that date, March 7th, 1946, it enacted its comprehensive zoning ordinance, No. 90500, which became effective June 1st, 1946. That by this ordinance, the city reaffirmed its classification of this community area as a residential area, and its exclusion therefrom of the business of mining rock aggregates, upon the following stated grounds: (1) the continuance of such restriction was "necessary in order to encourage the most appropriate use of land; to conserve and stabilize the value of property; to provide adequate open spaces for light and air; . . . to facilitate adequate provisions for community utilities and facilities such as, transportation, water, sewerage, schools, parks and other public requirements, and to promote health, safety and the general welfare, all in accordance with a comprehensive plan"; that during the 32-year period from 1914 (the year of the deed restrictions), to October 2d, 1946 (the date of the permit challenged here), this community area, of less than one and one-half square miles, was improved with (1) more than 360 homes occupied by more than 1,750 persons of whom more than 350 were children under the age of 16 years; (2) two churches, attended by more than 300 persons

each Sunday; (3) a kindergarten and elementary grade school attended by 418 pupils; (4) a public park and recreation center attended by more than 200 persons each day, and 2,000 persons each week, many of whom are children under the age of 6 years, who unattended, patronize the facilities of said recreation center, and for which the city expends about $6,000 annually for its supervised recreational facilities at this park; (5) a city fire department which in efficiency is about four times greater than that required by the National Fire Underwriters Board; an American Legion hall adequate for the needs of a membership of 118, and a medical clinic; that during the two and one-half years immediately preceding October 2d, 1946, 14 of the named plaintiffs, at a cost to them of more than $150,000, purchased and improved their home properties which lie either immediately adjoining the critical area involved here, or immediately across a 40-foot street from said critical area. In their purchase of these homes many of these purchasers first inquired of the city as to the zoning restrictions, and were told by the city that this area was zoned for residential use, and that several applications for permission to excavate rock aggregates in this community area had been denied by the city. These persons testified that they would not have purchased or improved these properties had they known there was any probability of permission being granted to excavate within this area for the production of rock aggregates; that in 1946, the assessed value of the land and improvements in private ownership within this community area of 1½ square miles, was about $500,000— an increase of about $150,000 over the preceding year. That the lands which comprise the critical area involved here have a reasonable market value of $2,500 per acre, if permission to produce rock aggregates therefrom is denied; that the defendant Gregg paid for the 105 acres of land covered by this permit during the five years immediately preceding October 2d, 1946, an aggregate sum of about $75,000. That there is, and was during the year 1946, preceding October 2d, a substantial demand for the land which comprises said critical area, for development and use for residential purposes, and that said land is reasonably adapted to that use; that during this 32-year period of residential classification, development, use, and protection against the invasion by the rock industry, no disturbing change in conditions has occurred within this community area.

What is termed the "permit" area is bounded on the west by Wicks Street, a dusty unimproved road, on the northeast by Dronfield and by Art Street (unpaved), Lot 23 of Block 17 and Lot 9 of Block 19, on the southeast by Peoria Street (which is paved), Lots 8, 11, 12, 15, 16, 17 and 18 in Block 19, and by Pendleton Street, which is not paved. What is referred to as the "community" area surrounds the "permit" area. Maps of these areas were introduced into evidence at the trial and are before us on this appeal. We will not attempt to delineate their boundaries in detail. With reference to the "community" area, suffice it to say that it encompasses a general area surrounding the "permit" area, including distances of from some 250 feet to 3,000 feet from the boundaries of the "permit" area. It is noteworthy that the varying distances at which the boundaries of the "community" area are drawn from the boundaries of the "permit" area serves to exclude existing gravel pits and other industrial uses inconsistent with the theory of a strictly residential district.

From a perusal of the voluminous record herein consisting of a reporter's transcript containing 5,082 pages of testimony, a clerk's transcript of 174 pages, 288 exhibits and 67 numbered paragraphs of findings, we deem it a fair statement to say that prior to June 1, 1946, the city of Los Angeles had no comprehensive zoning ordinance, rather, there existed a series of heterogeneous zoning ordinances applicable to various parts of the municipality and which, as testimony in this case indicates, were considered as stopgap ordinances to be eventually absorbed by a single comprehensive zoning ordinance. Contained in all of these ordinances were provisions for exceptions, and many were granted.

The first comprehensive zoning ordinance and the one with which we are here concerned, was adopted and became effective June 1, 1946, being Ordinance No. 90500 of defendant city. The record reflects that during the period of more than a year prior to its adoption while surveys were being made and the ordinance was in process of preparation, defendant Gregg's property, which is the subject of this appeal, was shown on the tentative zoning map as M-3, which would permit the excavation of rock thereon. However, when the ordinance was finally adopted by the city council it absolutely classified defendant Gregg's property in an R-A zone, which permitted residential and agricultural uses and excluded the excavation of rock, sand or gravel.

However, the ordinance as adopted, provided for the granting of variances from its existing provisions. Also, section 12.24 of said ordinance provided for the granting of conditional use permits by the planning commission or the city council to permit certain uses, of public concern, in zones from which such uses would otherwise be excluded, when it be found that such uses are deemed essential or desirable to the public convenience or welfare. We find included in such permitted uses, of public concern, the "development of natural resources."

Shortly after the effective date of the foregoing ordinance, defendant Gregg, pursuant to the provisions of section 12.24 thereof, applied to the planning commission of defendant city for a permit to excavate about 105 acres of the property owned by him, for the development of the natural resources on his property, namely rock, sand and gravel. On July 26, 1947, said planning commission denied defendant Gregg's application upon the grounds (1) that an excavation for the commercial production of rock, sand, and gravel, was not the highest and best use of said land; (2) that said property is adapted to residential development and use; (3) that the "RA" zoning then upon said property, was appropriate for said property, and for that general area, as evidenced by the residential development in that immediate neighborhood; (4) that the pit which would be left after the excavation was completed, would create an unsightly and dangerous condition, detrimental to the public welfare and safety, and would leave the land in a condition unsuited for use in keeping with others in that community; (5) that the creation of such a condition would adversely affect individual property rights, and would interfere with the normal growth of that community, and (6) would conflict with the objectives of the city's master plan of zoning.

Thereupon, defendant Gregg, in accordance with further provisions of the ordinance, appealed to the city council from the adverse ruling by the city planning commission. The exhibits on file demonstrate that the claimed merits and demerits of defendant Gregg's application were presented both to the city planning commission and to the city council in detail, and afforded both of these bodies ample evidence upon which to arrive at an informed opinion and conclusion.

A public hearing on defendant Gregg's application was first conducted before the planning committee of the city council and later before the council itself. Both the proponent and

the protestants were allowed approximately the same time, "between an hour and an hour and a half" before the planning committee of the city council, at which many witnesses were heard. When the report of that committee was submitted to the council as a whole, another public hearing was held, at which the protestants requested one hour in which to present their claims. However, the president of the council ruled that each side should have 30 minutes. Following this hearing, the city council voted to grant the application of defendant Gregg. The instant action ensued, and from the judgment therein entered as aforesaid in favor of defendants, plaintiffs prosecute this appeal.

Appellants' first ground of appeal is that the grant of the foregoing permit to defendant Gregg is unconstitutional and void because such action is in excess of the authority delegated to the council by Ordinance No. 90500. This contention is predicated upon the claim that the authority delegated by the ordinance to the council is expressly limited to permit only such uses of property as are "essential or desirable to the public convenience or welfare, and are in harmony with the various elements or objectives of the Master Plan." That the stated "objectives" of the master plan as contained in section 12.02 of the ordinance preclude the granting of a permit such as the one here under consideration, which according to appellants, would injuriously affect the enjoyment by them of their properties, would jeopardize the safety of children in the community, and would militate against the promotion of the "health, safety and general welfare, all in accordance with a comprehensive plan" (Ordinance 90500, § 12.02).

Sections 12.24 and 12.32-E of the ordinance authorize the council to grant a conditional use permit upon a finding that the permitted uses of the property are essential or desirable to the public convenience or welfare, and are in harmony with the various elements or objectives of the master plan. In the proceedings now before us the council in granting the challenged permit affirmatively found those conditions to exist and further found wherein the planning commission in theretofore denying the permit, was in error. The fact that the council made such findings raises the presumption that the existence of the necessary facts had been ascertained and found (*Northside Property Owners Assoc.* v. *County of Los Angeles,* 70 Cal.App.2d 598, 608 [161 P.2d 613]; *Lindell Co.* v. *Board of Permit Appeals,* 23 Cal.2d 303, 323 [144 P.2d 4];

*Bartholomae Oil Corp.* v. *Seager,* 35 Cal.App.2d 77, 80 [94 P.2d 614]).

 The necessity for a conditional use permit is to be determined under section 12.24 of the ordinance by the planning commission or the city council, and their judgment should be final unless it clearly appears to be arbitrary or contrary to the law. Where a zoning ordinance authorizes the planning commission or city council to grant a conditional use permit upon finding the existence of certain facts, their action will not be disturbed by the courts in the absence of a clear and convincing showing of the abuse of the power of discretion vested in them (*Otis* v. *City of Los Angeles,* 52 Cal. App.2d 605, 613 [126 P.2d 954]). Whether or not the granting of the permit herein was wise as a matter of policy is something which is beyond the courts to determine unless the ordinance under which such action is taken is unconstitutional or void. The rule is indelibly written into our law that all questions of policy and wisdom concerning matters of municipal affairs are for the determination of the legislative governing body of the municipality and not for the courts. In the exercise of the policy power a large discretion is vested in the legislative branch of the government. The function of the courts is to determine whether or not the municipal bodies acted within the limits of their power and discretion. Courts are not authorized to entertain a hearing de novo and then make such order as in their opinion the municipal authorities should have made. Were the rule otherwise, courts would be usurping the functions of the municipal governing body (*Lockard* v. *City of Los Angeles,* 33 Cal.2d 453, 461 [202 P.2d 38]).

 The determination of what harmonizes with the elements and objectives of the master zoning plan having been committed to the discretion of the local governing bodies, the burden of proving that the city council acted without substantial evidence and in excess of jurisdiction, rested upon appellants. And this requirement is not satisfied by a mere showing that there was a conflict in the evidence, or that the city council on the basis of the record before it, might have been justified in deciding differently, or that the record before the council might have supported a conclusion contrary to that which was arrived at (*Hogan* v. *Retirement Board,* 13 Cal.App.2d 676, 677 [57 P.2d 520]). It therefore follows that the ordinance here in question and the procedure therein authorized is neither unconstitutional or void.

■ It is next contended that the power vested in the planning commission in the first instance, and in the city council on appeal, to grant a conditional use permit under section 12.24 of Ordinance No. 90500, constitutes an unlawful delegation of legislative power. This claim is without merit. We are persuaded that a finding by the planning commission in the first instance, or, as in the case at bar, by the city council on appeal, of the necessary facts to justify the granting of a conditional use permit under section 12.24 of the ordinance is an exercise of quasi judicial, or perhaps administrative power, and does not amount to an exercise of legislative power (*Nider* v. *Homan,* 32 Cal.App.2d 11, 15 [89 P.2d 136] ; *Swars* v. *City of Vallejo,* 64 Cal.App.2d 858, 864 [149 P.2d 397] ; *Wallace* v. *Board of Education,* 63 Cal.App.2d 611, 616 [147 P.2d 8] ; *Irvine* v. *Citrus Pest District,* 62 Cal.App.2d 378, 385 [144 P.2d 857] ). ■ The essential requirement of due process is met when the administrative body is required to determine the existence or nonexistence of the necessary facts before any decision is made. Such a discretion is not arbitrary or so unguided as to invalidate the statute or ordinance (*People* v. *Walton,* 70 Cal.App.2d Supp. 862, 870 [161 P.2d 498] ).

As was said by the Supreme Court in *Gaylord* v. *City of Pasadena,* 175 Cal. 433, 436 [166 P. 348] :

"Even a casual observer of governmental growth and development must have observed the ever-increasing multiplicity and complexity of administrative affairs—national, state, and municipal—and even the occasional reader of the law must have perceived that from necessity, if for no better grounded reason, it has become increasingly imperative that many *quasi*-legislative and *quasi*-judicial functions, which in similar communities and under more primitive conditions were performed directly by the legislative or judicial branches of the government, are intrusted to departments, boards, commissions and agents. No sound objection can longer be successfully advanced to this growing method of transacting public business. These things must be done in this way or they cannot be done at all, and their doing, in a very real sense, makes for the safety of the republic, and is thus sanctioned by the highest law. For, as the supreme court of the United States declares: 'Indeed, it is not too much to say that a denial to Congress of the right, under the Constitution, to delegate the power to determine some fact or the state of things upon which the enforcement of its enactment depends, would be "to stop the wheels of government" and bring about con-

fusion, if not paralysis, in the conduct of the public business' (*Union Bridge Co.* v. *United States,* 204 U.S. 364 [51 L.Ed. 523, 27 S.Ct. 367].)'' See, also, *Dierssen* v. *Civil Service Commission,* 43 Cal.App.2d 53, 59 [110 P.2d 513], and *Carter* v. *Stevens,* 211 Cal. 281, 289 [295 P. 28].

In the case of *Johnston* v. *Board of Supervisors,* 31 Cal.2d 66, 73 [187 P.2d 686], it was held that ''The general rule, however, is that even the broader power to authorize a variance from the terms of a zoning ordinance may be granted to an administrative board without violating the principle against the delegation of legislative powers.'' ▉ While the legislative body cannot delegate its power to make a law, it can make a law to delegate a power to determine some fact or state of things upon which the law makes or intends to make its own action depend.

It must therefore be held that the power granted by section 12.24 of the ordinance to the planning commission in the first instance, and to the city council on appeal, to grant conditional use permits in the particular instances specified, was not intended to, nor does it confer any power to amend or alter the zoning ordinance itself, nor does it delegate any legislative power. Neither is it a grant of power to create variances for nonconforming uses. That power is contained in section 12.26 of the ordinance. It will be noted that conditional use permits are confined to uses of public concern, such as airports, cemeteries, development of natural resources, public utilities, educational institutions, libraries, and governmental enterprises. By the specific terms of the ordinance such uses are permitted in any zoning district subject only to a finding by the planning commission, in the first instance, or the city council on appeal, that the use is essential or desirable to the public convenience or welfare. ▉ The decision to grant a conditional use permit does not create a new zone. It merely affirms as a fact the existence of the circumstances under which the ordinance by its terms prescribes that such permit shall issue.

▉ Appellants next assail the granting of the conditional use permit herein as unconstitutional and void because, as they contend, the act is an unreasonable, and therefore, an unconstitutional exercise of the police power. As we view appellants' argument in this regard, they do not attack the constitutionality of the ordinance, indeed, they rely upon it and attack as unconstitutional the action of the city council in granting the conditional use permit in this particular

instance because such action was unreasonable. Appellants urge that the action of the council was unreasonable and in excess of the authority delegated to it by Ordinance No. 90500 for the reason that the conditional use permit does not harmonize with the elements or objectives of the master plan. It would appear that the ''Master Plan'' is something distinct from the zoning ordinance. It is authorized by ''The Planning Act of 1929'' (Stats. 1929, p. 1805; 2 Deering's Gen. Laws, Act 5211b). A reading of the Planning Act of 1929 reveals the ''Master Plan'' to be ''a comprehensive, long-term general plan for the physical development of the city . . . which in the commission's judgment bears relation to the planning thereof.'' The zoning ordinance may have been adopted to implement the ''Master Plan,'' but it is not the plan itself. In any event, the ''Master Plan'' with its accompanying maps, diagrams, charts and reports (as provided for in the foregoing Planning Act of 1929) was not introduced into evidence. There was, however, the testimony of a former director of city planning of defendant city to the effect that the conditional use permit was in harmony with the master plan. And the city council specifically found that the conditional use permit was ''essential to the public convenience and welfare and is in harmony with the various elements or objectives of the Master Plan.'' Accordingly, there arose a presumption of the existence of the necessary facts to support such finding (*Northside Property Owners Association* v. *County of Los Angeles, supra,* p. 608; *Lindell Co.* v. *Board of Public Appeals, supra,* p. 323; *Bartholomae Oil Corp.* v. *Seager, supra,* p. 80). This presumption was not overcome, but in fact, was strengthened by the evidence. The finding of the trial court that the conditional use permit was not repugnant to the master plan was justified and proper. We perceive nothing unreasonable in the action of the city council granting the conditional use permit to defendant Gregg. The latter was possessed of an inherent right to remove rock and gravel from his own land unless and until prohibited by an exercise of the police power of the city of Los Angeles. By the adoption of Ordinance 90500 that right was suspended. The granting of the permit did not give defendant Gregg any right not theretofore vested in him. It merely removed the impediment imposed by the exercise of the police power. And the reasonableness of the zoning as applied to certain lines of commercial zoning must be distinguished from the reasonableness of zoning regulations prohibiting the development of

natural resources. The exclusion of ordinary business enterprises does not destroy any inherent property right, and, if not discriminatory, will be held reasonable and valid. Most such businesses can be conducted at any other designated place. But rock and gravel, like any other natural resource, can be obtained only in those particular areas where the deposit has been lodged by nature. Therefore, it follows that to absolutely prohibit the removal of rock, sand and gravel from one's own land in an instance where such land is primarily valuable only by reason of the existence of rock, sand and gravel, might be regarded as an unreasonable exercise of the police power (*Trans-Oceanic Oil Corp.* v. *City of Santa Barbara*, 85 Cal.App.2d 776, 789 [194 P.2d 148]). The permit granted respondent Gregg does not restrict appellants in the use of their own property. And they have no vested right in the maintenance of restrictions on respondent Gregg's property. It may be true that to continue the zoning restrictions upon respondent Gregg's property might have conferred benefit on neighboring owners and enhanced the value of their property, but the existence of benefits does not generate interests protected by the Constitution against diminution by governmental authorities in the proper exercise of the police power. ▆▆ Zoning regulations are not contracts by the city and may therefore be modified by the latter. Property is always held subject to the valid exercise of police power. ▆▆ The theory of vested rights relates only to such rights as an owner of property may possess not to have his property rezoned after he has started construction thereon or was making a use thereof permitted by law, when such construction or use does not constitute a nuisance (*Dobbins* v. *City of Los Angeles*, 195 U.S. 223 [25 S.Ct. 18, 49 L.Ed. 169, 176] ; *Trans-Oceanic Oil Corp.* v. *City of Santa Barbara, supra*, p. 787). The adoption of Zoning Ordinance No. 90500 gave appellants no vested rights which would prevent defendant city from subsequently amending the ordinance or granting a conditional use permit thereunder. ▆▆ The provisions of the ordinance restricting the uses to which respondent Gregg's property could be put did not result in a contract with appellants divesting the city of the right to subsequently change the ordinance or to grant a conditional use permit adversely affecting the property of appellants. (*Acker* v. *Baldwin*, 18 Cal.2d 341, 345 [115 P.2d 455] ; *Otis* v. *City of Los Angeles, supra*, p. 613). As affecting the challenged reasonableness of the action of

the city council in granting respondent Gregg a conditional use permit, there was testimony that his property is located in an area which has long been a rock and gravel producing section. That within a radius of a mile and a quarter from the subject property are located 15 gravel pits, some active and others idle. That there is a public need for the rock and sand located on this particular property, and that it would be compatible with the greatest public service and the least private injury to expand the M-3 or unrestricted use zone to include all of the land in an area in which the Gregg property is located. There is also evidence in the record that the highest and best use of the subject property is for the excavation of rock, sand and gravel, and that said land has little value for any other use; that if the Gregg plant were forced to shut down for lack of materials, it would be impossible to furnish the city of Los Angeles with its requirements of rock and sand; that the Gregg plant supplies approximately 30 per cent of all of the rock and gravel mined from the San Fernando area, and that if this plant were shut down, there are no other plant facilities at this time available to supply the resulting deficit; that the Gregg plant is the most modern plant in the San Fernando Valley; that nowhere in the United States have conditions been attached to the operation of rock and gravel properties as stringent as those attached by the city council to the operations in the subject area, and that the operation of the subject property under the permit will constitute a reasonable and necessary method of operation usually and ordinarily conducted by rock plants.

The transcript contains volume after volume of additional testimony and evidence showing the public necessity and the reasonableness of the city council's action in granting the permit.

In addition, there is the fact that by stipulation the trial judge spent two whole days personally viewing the entire area, including all of the rock plants, and also including all of the properties owned by plaintiffs herein. It is well settled that when a trial judge by stipulation of the parties, as here, views the territory involved in an action, his observations on such a tour become evidence in the case (*Safeway Stores, Inc.* v. *City Council,* 86 Cal.App.2d 277, 284 [194 P.2d 720]), and that what is then seen may be used alone or with other evidence to support the findings (*Neel* v. *Mannings, Inc.,* 19 Cal.2d 647 [122 P.2d 576]; 24 Cal.Jur.,

p. 921; *Gularte* v. *Martins,* 65 Cal.App.2d 817 [151 P.2d 570]; see, also, collection of authorities cited in McBaine Cal. Evidence Manuel (1948 Supp.), p. 32). It therefore follows that independent evidence consisting of the view by the court must be considered as having supported the reasonableness of the city council's act in granting the conditional use permit, especially when considered in connection with the vast volume of testimony in support thereof as disclosed by the transcript.

As a further ground for reversal, appellants assert that the permit granted respondent Gregg is void, "because the City is estopped in the circumstances of this case, to thus impair the personal and property rights" of appellants.

As we have heretofore pointed out, no person has a vested right in the exercise of the police power and exercise of the same may not be limited by private contract or restrictive covenants (*Acker* v. *Baldwin, supra,* p. 345). Private agreements are not to be considered when determining the validity of a zoning ordinance (*O'Rourke* v. *Teeters,* 63 Cal.App.2d 349, 352 [146 P.2d 983]). Appellants' contention that an estoppel arises because, prior to the year 1946 the Gregg and surrounding lands had been zoned for residential purposes is equally unavailing. The existence of such zoning ordinance gave appellants no vested right which would operate to prevent defendant city from subsequently amending the ordinance. And, as a matter of fact, the conditional use permit granted respondent Gregg was not the result of an amendment to the ordinance, but was in conformity with the existing provisions thereof. Appellants place great reliance upon the case of *Times-Mirror Co.* v. *Superior Court,* 3 Cal.2d 309 [44 P.2d 547], but the facts of that case are clearly distinguishable from those in the case at bar. It is only in exceptional cases that estoppels against public authority may be invoked. And the cases wherein the doctrine was applied all involved most unusual sets of facts. As was said by this court in *Donovan* v. *City of Santa Monica,* 88 Cal. App.2d 386, 394 [199 P.2d 51]: "There is no doubt that the general rule is that estoppel will not be invoked against the government or its agencies except in rare and unusual circumstances. (See cases connected in 19 Am.Jur., p. 818 § 166.)" We find no analogy between the facts in the case now engaging our attention and those cases wherein the doctrine of estoppel has been invoked against the municipality.

Appellants' next contention is that in a suit in equity such as the one now before us the reasonableness of the act done presents a judicial, not a legislative question, and that it becomes the duty of the court to hear and determine that question upon its own record of individual investigation and upon its own responsibility. We deem it unnecessary to discuss this claim because that is exactly what the court did in the instant case. It did not limit its investigation to the record before the city council. True, the court found that the action of the city council in granting the conditional use permit was neither arbitrary, capricious nor unreasonable, but in arriving at that conclusion the court did not accept the record before the city council as final and conclusive. In determining the legality and reasonableness of the council's action, as well as the question of whether needless oppression was wrought by such action and whether constitutional rights were thereby invaded, the court not only heard over 5,000 pages of testimony and considered 288 separate exhibits, but in addition, made its own individual investigation by viewing the subject property and surrounding territory for two days, which, as hereinbefore indicated, in itself constitutes a species of evidence. Manifestly, the determination of the issues in this case was made on the court's "investigation upon its own responsibility," and was not confined to a consideration solely of the record before the city council.

Appellants next contend that in this action in equity they are entitled to an injunction to prevent a threatened interference with their constitutional right to own and enjoy their property. Although not specifically stated in appellants' briefs, an examination of the pleadings coupled with the arguments advanced in their briefs leads us to the conclusion that appellants seek to enjoin respondent Gregg's operations as an anticipated nuisance. When viewed in the light of the conditions imposed by the city council in granting the conditional use permit and the additional conditions imposed by the trial court in its judgment, we are persuaded that the conduct of respondent Gregg's operations, subject to the foregoing conditions imposed thereon, justified the conclusion of the trial court that the same would not result in any substantial injury to appellants nor to the ownership or enjoyment of their property.

Where as here, the operations in question could not be characterized as a nuisance *per se*, the court was justified in following a well established rule of law which provides that

under such circumstances the decree should not enjoin more than the specific thing which might constitute a nuisance, as appears from the requirements of the particular case (Pomeroy's Equity Juris. (2d ed.), §§ 1945, 1948). ▮ It is now established law in this state that the business of excavating rock and gravel by the owner from lands belonging to him is a lawful and useful occupation, and the regulation thereof should go no further than to control those particular features of the operations which might result in substantial injury to adjoining property or to persons residing or owning property in the near vicinity of the land upon which the operations are being conducted (*People* v. *Hawley*, 207 Cal. 395, 412 [279 P. 136]; *In re Smith*, 143 Cal. 368, 371 [77 P. 180]; *In re Kelso*, 147 Cal. 609, 613 [82 P. 241, 109 Am.St.Rep. 178, 2 L.R.A.N.S. 796]; *Byers* v. *Colonial Irrigation Co.*, 134 Cal. 553, 555 [66 P. 732]; *Vowinckel* v. *N. Clark & Sons*, 216 Cal. 156, 162 [13 P.2d 733]).

There is substantial evidence in the record herein that respondent Gregg's plant is the most modern in the San Fernando Valley and that the operation of the plant under the restrictive terms of the conditional use permit and the judgment will constitute a reasonable method of operation in the manner usually and ordinarily governing the operation of rock plants. The court was therefore justified in giving heed to the aforesaid rule, that in proper cases it will not enjoin the conduct of a defendant's entire business where such business is not a nuisance *per se* if less measure of restriction will afford plaintiffs the relief to which they may be entitled.

▮ Appellants' contention that the court in the present action in equity was clothed with jurisdiction to absolutely prohibit respondent Gregg's operations is further answered by the provisions of section 731a of the Code of Civil Procedure reading as follows:

"731a. [Manufacturing or commercial operations in established zones not enjoinable nor deemed nuisance: Operation producing offensive odors.] Whenever any city, city and county, or county shall have established zones or districts under authority of law wherein certain manufacturing or commercial uses are expressly permitted, no person or persons, firm or corporation shall be enjoined or restrained by the injunctive process from the reasonable and necessary operation in any such industrial or commercial zone of any use

expressly permitted therein, nor shall such use be deemed a nuisance without evidence of the employment of unnecessary and injurious methods of operation . . .''

While respondent Gregg was not operating in a zone wherein ''manufacturing or commercial uses are expressly permitted,'' he was operating in a zone in which the ordinance authorized the issuance of conditional use permits, and the evidence adduced at the trial brings this case within the provisions of section 731a of the Code of Civil Procedure above quoted. There being no evidence that respondent Gregg employed, or under the restrictions of the permit and judgment, would employ unnecessary and injurious methods of operation, the trial court was not authorized to grant appellants injunctive relief (*McNeill* v. *Redington*, 67 Cal.App.2d 315, 318 [154 P.2d 428]; *Northside Property Owners Assoc.* v. *Hillside Memorial Park*, 70 Cal.App.2d 609, 617, 618 [161 P.2d 618]).

Furthermore, section 3482 of the Civil Code reads as follows:

, ''Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance.'' Ordinance No. 90500, having been duly enacted by the city of Los Angeles within the scope of the authority conferred upon it, has the same force within its corporate limits as a statute passed by the Legislature has throughout the state (*Monterey Club* v. *Superior Court*, 48 Cal.App.2d 131, 147 [119 P.2d 349]; *Ex parte Roach*, 104 Cal. 272, 274 [37 P. 1044]). As heretofore pointed out, respondent Gregg was operating pursuant to a permit authorized by the city ordinance.

Appellants challenge 46 of the 67 numbered paragraphs of Findings of Fact, declaring in that regard that ''There is no evidence in this record which supports any of the Findings of Fact here challenged. Wherein a so-called Finding of Fact, is a conclusion of law, such conclusion is without any support in legal authority.''

 It would unduly prolong this already lengthy opinion to discuss seriatim the challenged findings and the objections made thereto. Suffice it to say that the affirmative findings are responsive to the issues framed and supported by substantial evidence, while the negative findings are justified by the rule that where no evidence is introduced in support of an issue findings should be made thereon against the party who has the burden of proof (*Haney* v. *Kinevan*, 73 Cal.App. 2d 343, 344 [166 P.2d 361]). The rule is elementary that

when an attack is made upon findings or a judgment upon the ground that they or it are or is not supported by the evidence the power of reviewing courts begins and ends with a determination of whether there is any substantial evidence contradicted or uncontradicted, which will sustain the findings made or the judgment rendered. An examination of the findings herein precludes a reversal of the judgment because we cannot say from a review of the record that, accepting the full force of the evidence adduced, together with every inference favorable to respondents which may be drawn therefrom, and excluding all evidence in conflict therewith, it still appears that the law precludes the challenged finding or findings made.

We have noted the other contentions made on this appeal, one by appellants that actual and punitive damages may be recovered in this form of action, and the other by respondents that appellants' case is moot by reason of the adoption of an ordinance by respondent city on January 5, 1948, amending sections 12.20 and 12.24 of the Los Angeles Municipal Code, of which Municipal Code Ordinance No. 90500 (here under consideration) is a part. In view of the foregoing conclusions at which we have arrived, we deem it unnecessary to discuss them.

For the foregoing reasons the judgment is affirmed.

York, P. J., and Doran, J., concurred.

A petition for a rehearing was denied March 21, 1949, and appellants' petition for a hearing by the Supreme Court was denied April 28, 1949.